UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re: SUNCOKE ENERGY PARTNERS, L.P. | C.A. No. 1:19-cv-00693-CFC |
| This Documents Relates To: All Actions | CLASS ACTION |

**CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934 AND DELAWARE STATE LAW**

**JURY TRIAL DEMANDED**

Lead Plaintiff Michael Cohn ("Lead Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:[1]

## NATURE OF THE ACTION AND CONFLICTS OF INTEREST

1. This action is brought as a class action by Lead Plaintiff on behalf of himself and the other minority (non-SXC affiliated) owners of the common units of SunCoke Energy Partners, L.P. ("SXCP" or the "Partnership" or "Target") against SXCP, the SXCP general partner, SunCoke Energy Partners, G.P. LLC ("General Partner" or "Buyer"), the members of the General Partner's Board of Directors (together with the General Partner, the "General Partner Defendants"), SunCoke

[1] Attached hereto as Exhibit A is the Affidavit M. Travis Keath, CFA, CPA/ABV, the full body of which is incorporated by reference.

Energy, Inc. ("SXC" or "SunCoke"), and the members of SXC's Board of Directors (together, the "SXC Defendants")[2] for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), Securities Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. 240.14a-9, Regulation G, 17 C.F.R. § 244.100, and Delaware State Law in connection with the merger (the "Merger") between SXCP and SXC, for acting in bad faith and violating the duty of good faith under the Limited Partnership Agreement, and for breaches of fiduciary duty owed to the minority unitholders of SXCP.

2. Defendant SXC, the acquiring entity, is a corporation whose shares are traded on the New York Stock Exchange under the ticker "SXC."

3. SXCP, the Target, is a limited partnership that traded, *independently of SXC*, on the New York Stock Exchange under the ticker "SXCP."

4. Since 2014, purchasers of SXCP units have relied on a Limited Partnership Agreement,[3] incorporated by reference herein, and a conflicts committee to shield them from inherent conflicts of interest created by SXC's control of SXCP's General Partner (the "Conflicts Committee").

---

2 SXCP, the General Partner, the General Partners' Board of Directors, SXC and the SXC board are also referred to herein collectively as the "Defendants."

3 First Amended and Restated Agreement of Limited Partnership of SunCoke Energy Partners, L.P. dated January 24, 2013 ("Limited Partnership Agreement"). *Available at* www.sec.gov/Archives/edgar/data/1555538/000119312513022346/d472248dex31.htm, the full body of which is incorporated by reference herein.

5. The diagram below, included in the Form S-4/A Registration Statement filed on April 30, 2019 on page 76 ("Registration Statement" or "S-4/A"),[4] shows how the entities not directly controlled by SXC (highlighted in yellow) are entangled in a web of entities controlled by SXC, including SXCP's General Partner, SunCoke Energy Partners GP, LLC.

This remainder of this page is left intentionally blank.

[4] Page numbers refer to the Amended Form S-4 Registration Statement filed on April 30, 2019. All versions of the Amended Form S-4 Registration Statement and all documents filed with the SEC regarding this Merger are incorporated by reference. *Available at* https://www.sec.gov/Archives/edgar/data/1514705/000119312519129819/d701044ds4a.htm.




6. SXCP's general partner, General Partner, is a Delaware limited liability company that is 100% owned by Defendant SXC through its wholly owned subsidiary, Sun Coal & Coke LLC ("SC&C").

7. Despite this entangled relationship, when SXC attempted to take over SXCP in 2016, the Conflicts Committee did its job and protected the interests of SXPC unitholders. When SXC failed to offer a fair price in 2016 and could not

obtain the approval of the Conflicts Committee, the parties broke off negotiations in 2017. The deal failed.

8. Two years later, when SXC again tried to purchase SXCP, having replaced members of the Conflicts Committee, the Conflicts Committees abrogated its duties to the unitholders of SXCP and made its final decision to support a binding agreement whereby the majority unitholder irrevocably committed to deliver its votes in favor of the Merger February 4, 2019, almost five months before the actual vote date on June 27, 2019!

9. Predictably, a great deal of new material information was disclosed during the five months the Conflicts Committed abrogated its duty to consider new information and to negotiate for a fair deal for the SXCP unitholders, including a 33% drop in the stock price of SXC from $10.93 per share on February 4, 2019 to $7.34 per share on May 31, 2019.

10. The Conflicts Committee did not review or consider the actual S-4 Proxy Solicitation filed with the SEC on March 8, 2019 (the "S-4"), and subsequent amendments thereto because that would have been "impossible," given the fact that it terminated its deliberations on February 4, 2019.

11. SXCP is governed by a Limited Partnership Agreement and the General Partner and SC&C are signatories to the Limited Partnership Agreement.

12. The General Partner, the General Partner Board of Directors, the

Conflicts Committee (defined below) *and any General Partner affiliates that cause the General Partner to act*, are obligated under the terms of the Limited Partnership Agreement to act in their respective capacities in **good faith**. Limited Partnership Agreement, Section 7.9.

13. On February 4, 2019, Defendants entered into an agreement and plan of merger ("Merger Agreement"), pursuant to which the Partnership's common unitholders received 1.40 shares of common stock of SunCoke for each SXCP unit they owned plus a fraction of a share of SunCoke common stock equal to the product of the number of days, beginning with the first day of the most recent full calendar quarter with respect to which an SXCP unitholder distribution record date has not occurred and ending on the day immediately prior to the closing of the merger, multiplied by a daily distribution rate equal to the quotient of the most recent regular quarterly cash distribution paid by SXCP divided by 90, whose product is then divided by $10.91, the closing price of SunCoke common stock as of February 1, 2019 (the "Merger Consideration"). Based on the exchange ratio and current trading price of SXC stock, the estimated per unit value of the Merger Consideration is approximately $10 per unit. SC&C was the record holder and beneficial owner in the aggregate of, and had the right to vote, 61.7% of the SXCP Common Units outstanding. S-4/A 31.

14. All SXCP unitholders and persons charged with deciding the vote of

unitholders, such as the members of the independent Conflicts Committee, were entitled to, but did not receive, full, fair and material information regarding the Merger pursuant to the securities laws including Sections 14(a) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, and Regulation G, 17 C.F.R. § 244.100.

15. The Conflicts Committee breached its duty of good faith and did not make, and could not have made, a fully informed, non-conflicted vote. First, the Registration Statement itself was materially incomplete and misleading, as alleged herein. Further, astoundingly, the supposedly independent Conflicts Committee finalized its decision and approved the Merger, and a Support Agreement[5] purporting to make the Merger a *fait accompli*, over a month before the Registration Statement was available. **It never claimed to have reviewed the single document the law requires to be published to ensure an informed vote, but instead relied only on information selected and provided to it by conflicted parties - thus negating the very purpose of a "conflicts" committee.** In Defendants' words, it "was not possible" that the Conflicts Committee considered the disclosures in the

---

[5] *See* Support Agreement, dated as of February 4, 2019, by and between SunCoke Energy Partners, L.P. and Sun Coal and Coke LLC, *available at* https://www.sec.gov/Archives/edgar/data/1514705/000119312519027607/d700877dex101.htm (the "Support Agreement"), the full body of which is incorporated by reference herein.

Registration Statement.[6]

16. Between February 4, 2019 (the date on which the Support Agreement was effective) and June 27, 2019 (the date on which the public shareholders of SXCP voted with respect to the Merger), the steel sector faced struggles that could not have been known to the conflicts committee when it approved the Merger on February 4, 2019. For example:

a. According to a March 18th, 2019 sector report by J.P. Morgan, the industry suffered a "steeper than expected price decline for steel sheet prices . . . ."[7]

b. Also on March 18th, 2019, J.P. Morgan lowered its financial performance outlook for AK Steel and U.S. Steel, which are two of SunCoke's three largest customers, comprising more than 40% of SunCoke's total revenue during each of the past three fiscal years.[8, 9]

---

6 The Conflicts Committee certainly did not rely on the Registration Statement in approving the Merger; that **was not possible**, because, the first version of the Registration Statement was not filed until *March 8, 2019*. *See* SXCP Preliminary Form S-4 Registration Statement (Mar. 8, 2019), *available at* www.sec.gov/Archives/edgar/data/1514705/000119312519069183/d701044ds4.htm.

7 J.P. Morgan, North America Equity Research 1 (Mar. 18, 2019).

8 *Id.* at 2, 5.

9 SunCoke Energy, Inc., Annual Report 73 (Form 10-K) (Feb. 15, 2019).

c. On May 23, 2019, Credit Suisse issued a steel sector forecast referring to continuing declines in hot-rolled coil steel prices as a "sheet tsunami," while anticipating further pressure on the domestic market for steel and a "collision course with new capacity / entrants."[10]

d. In light of its bearish industry outlook, Credit Suisse downgraded AK Steel (citing "much greater balance sheet risk") and U.S. Steel (which was said to be "no longer running to stand still but sprinting to stand still"), among other companies.[11]

17. Amid this challenging industry backdrop, SXC's stock price – the sole source of consideration to SXCP unitholders – declined significantly, from a closing price of $10.93 the day before the Merger announcement, to:

a. $10.11, for a one-day decline of 7.5% upon announcement of the Merger on February 5;

b. $8.72 (a decline of 20.2% versus the pre-announcement price) on April 11, the date the Registration Statement was filed with the SEC;

---

10 Credit Suisse, U.S. Steel Sector Forecast 1, 4 (May 23, 2019).

11 *Id.* at 21, 40.

c. $8.46 (a decline of 22.6%) on April 24, the date upon which SunCoke's first-quarter financial results were released;

d. $7.34 (a decline of 32.8%) on May 31, which marked the lowest closing price between the Merger's announcement and its completion; and

e. $8.69 (a decline of 20.5%) on the June 27 vote date.

18. As compared to the $15.30 in Merger Consideration implied by SunCoke's February 4 closing price,[12] the corresponding implied values of the Merger consideration for each SXCP unit was based on the alternative dates listed in the previous paragraph were:

a. $14.15 on February 5;

b. $12.21 on April 11;

c. $11.84 on April 24;

d. $10.28 on May 31; and

e. $12.17 on June 27.

19. The General Partner and General Partner Defendants breached their duty of good faith required under the Limited Partnership Agreement and acted in bad faith, and breached their fiduciary duties owed to minority unitholders by

---

12 To provide more meaningful comparisons, the temporally prorated dividend-replacement component of the Merger Consideration formula was excluded in the calculations underlying this paragraph.

orchestrating and agreeing to a process whereby there was a sham decision by the Conflicts Committee that should be considered a nullity. By violating the terms of the Limited Partnership Agreement through bad faith, SXCP and the General Partner Defendants have lost the protections afforded to limit their duties under the Limited Partnership Agreement and are subject to fiduciary duties under the Delaware Corporate Code, which fiduciary duties have been violated based on the allegations herein.

## JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Lead Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

21. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

22. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because SXCP is incorporated in this District.

## PARTIES

23. Lead Plaintiff is, and at all relevant times has been, a holder of SXCP common units.

24. Defendant SXCP was a publicly traded limited partnership formed under the laws of the state of Delaware and maintains its principal executive offices at 1011 Warrenville Road, Suite 600, Lisle, Illinois 60532. The Partnership's common units traded on the NYSE under the ticker symbol "SXCP."

25. Defendant SunCoke Energy, Inc. is incorporated in Delaware and maintains its principal executive offices at 1011 Warrenville Road, Suite 600, Lisle, Illinois 60532. The company's common stock trades on the NYSE under the ticker symbol "SXC."

26. Individual Defendant Michael G. Rippey two hats. He is the President, Chief Executive Officer and a member of the SXC Board of Directors (Buyer). He is also Chairman, CEO, and President of the General Partner (manager of the Target).

27. Individual Defendant Alvin Bledsoe likewise wore two hats. He was simultaneously on the Board of Directors of SXP (Buyer), and the Board of Directors

of the General Partner (manager of the Target).

28. Individual Defendant P. Michael Hardesty is the Senior Vice President of Commercial Operations for both the General Partner (manager of the Target) and SXC (Buyer), and also a director of the General Partner (manager of Target).

29. Individual Defendant John W. Somerhalder II is a director of the General Partner, who was appointed after the failed takeover attempt in 2017, and served as one of two purportedly independent Board members that form the Conflicts Committee of the SXCP board.

30. Individual Defendant Fay West wears four hats. She is the Chief Financial Officer and a Senior Vice President of SXC (Buyer), the Chief Financial Officer and Senior Vice President of the General Partner (the manager of the Target), is a director of the General Partner (manager of the Target), and is the Senior Vice President and Chief Financial Officer for SC&C, the limited partner which owned 61.7% of the units of SXCP. The extremely conflicted position the General Partner is in is highlighted by the fact that its Director, Fay West, is the sole signatory for each of the parties to the Support Agreement which agreement purported to have delivered the necessary votes for SunCoke to acquire SXCP, and obsolete the need for any vote from the minority shareholders of SXCP.

IN WITNESS WHEREOF, SXCP and the Unitholder have caused to be executed or executed this Agreement as of the date first written above.

**SUNCOKE ENERGY PARTNERS, L.P.**

By: SunCoke Energy Partners GP LLC, its general partner

By: /s/ Fay West
Name: Fay West
Title: Senior Vice President and Chief Financial Officer

**SUN COAL & COKE LLC**

By: /s/ Fay West
Name: Fay West
Title: Senior Vice President and Chief Financial Officer

SIGNATURE PAGE TO SUPPORT AGREEMENT

31. Individual Defendant Katherine T. Gates is a Senior Vice President, Chief Compliance Officer and General Counsel for both SXC (Buyer) and the General Partner (manager of the Target), and is also a director of the General Partner (manager of the Target).

32. Individual Defendant Martha Carnes was a director of the General Partner, was appointed after the failed takeover attempt in 2017, and served as one of two purportedly independent Board members that formed the Conflicts Committee of the SXCP board.

33. Individual Defendant John W. Rowe is SXC's Chairman and has been a director of SXC since April 2012.

34. Individual Defendant Peter B. Hamilton has been a director of SXC since June 2011.

35. Individual Defendant James E. Sweetnam has been a director of SXC since January 2012.

36. Individual Defendant Susan R. Landahl has been a director of SXC since September 2017.

37. Individual Defendant Robert A. Peiser was a director of SXC at all relevant times.

38. The Individual Defendants referred to in paragraphs 26-37 are collectively referred to herein as the "Individual Defendants" and/or the "Board Members."

39. The General Partner Defendant, SunCoke Energy Partners GP LLC, is the SXCP general partner and is a single-member Delaware limited liability company.

40. Non-party Sun Coal & Coke, LLC is the single member of SunCoke Energy Partners GP LLC and is a Delaware limited liability company. Sun Coal & Coke, LLC is wholly owned by SunCoke. Sun Coal & Coke, LLC was the record and beneficial owner of 61.7% of SXCP outstanding units.

## CLASS ACTION ALLEGATIONS

41. Lead Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other minority unitholders of SXCP (the "Class").

42. This action is properly maintainable as a class action because:

a. The Class is so numerous that joinder of all members is impracticable. As of April 11, 2019, there were approximately 47,000,000

units of SXCP common units outstanding, held by hundreds of individuals and entities scattered throughout the country;

b. There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i) whether the SXCP Defendants and the General Partner Defendant disclosed material information that includes non-GAAP financial measures without providing a reconciliation of the same non-GAAP financial measures to their most directly comparable GAAP equivalent in violation of Section 14(a) of the Exchange Act;

ii) whether the SXCP Board members and the General Partner's Board members have misrepresented or omitted material information concerning the Merger in the S-4/A in violation of Section 14(a) of the Exchange Act;

iii) whether the General Partner Board members have violated Section 20(a) of the Exchange Act;

iv) whether the General Partner Defendants and the SXCP Defendants have breached their fiduciary duties and duties of good faith and acted in bad faith;

v) whether Lead Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their units regarding the Merger based on the materially incomplete and misleading S-4/A; and

vi) whether Lead Plaintiff and other members of the Class will suffer economic damages if the Merger is completed.

c. Lead Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d. Lead Plaintiff's claims are typical of the claims of the other members of the Class and Lead Plaintiff does not have any interests adverse to the Class;

e. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f. Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g. A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

### I. The Merger

43. SXCP is a Master Limited Partnership that primarily produces coke used for the blast furnace production of steel in the United States. The Partnership has two operating segments, Domestic Coke and Logistics. SXCP also provides metallurgical and thermal coal mixing and handling terminal services, as well as operates an export terminal in the United States Gulf Coast. The Partnership also provides coal handling and/or mixing services to steel, coke, electric utility and coal mining customers.

44. On February 5, 2019, Defendants issued a joint press release announcing the Merger, which states in pertinent part:

> LISLE, Ill., Feb. 5, 2019 /PRNewswire/ -- SunCoke Energy, Inc. (NYSE: SXC) and SunCoke Energy Partners, L.P. (NYSE: SXCP) today announced that they have entered into a definitive agreement whereby SXC will acquire all outstanding common units of SXCP not already owned by SXC in a stock-for-unit merger transaction (the "Simplification Transaction"). The Simplification Transaction is expected to close late in the second quarter or early in the third quarter of 2019, subject to customary closing conditions. Pursuant to the terms of the merger agreement, SXCP unaffiliated common unitholders will receive 1.40 SXC common shares for each SXCP common unit. The SXCP unit price implied by the exchange ratio represents a 9.3% premium to SXCP's closing price on February 4, 2019 and a 12.7% premium, based on SXC's and SXCP's 30-day volume weighted average prices ending February 4, 2019.

"We are pleased to announce this transaction today along with strong financial and operating results for the fourth quarter and full-year 2018," said Mike Rippey, President and Chief Executive Officer of SXC. "We believe there are clear benefits to this Simplification Transaction, as we will be able to unlock our full potential. With a simplified corporate structure, increased liquidity and improved financial flexibility, we will be better positioned to execute on our strategic growth opportunities and generate immediate and long-term value for SXC and SXCP stakeholders alike."

On behalf of SXCP, the terms of the Simplification Transaction were negotiated, reviewed and approved by the conflicts committee of the board of directors of SXCP's general partner, which committee consisted solely of independent directors. The conflicts committee also recommended that the board of directors of SXCP's general partner approve the transaction. The transaction was approved by the board of directors of SXCP's general partner and the board of directors of SXC.

**TRANSACTION BENEFITS**

- Simplifies the organizational and governance structure, reducing complexity for investors
- Creates a larger publicly-traded company, increasing public float and enhancing trading liquidity
- Immediately accretive to SXC shareholders
- SXC intends to initiate a $0.24 annual dividend per share in the first full quarter after closing the transaction
- Improved credit profile and enhanced access to capital markets lowers cost of capital
- Consolidation of cash flow and elimination of MLP distribution accelerates objective of reducing leverage
- Estimated cost synergies of approximately $2 million per year from eliminating dual public company requirements and estimated cash tax savings of approximately $40 million over the next five years
- More cash flow available to deploy for organic growth projects, attractive M&A opportunities and/or to return capital to shareholders
- Eliminates MLP qualifying income limitations on growth

**SIMPLIFICATION TRANSACTION DETAILS**

Pursuant to the terms of the merger agreement, SXC will acquire all of the outstanding SXCP common units that it does not already own. SXCP common unitholders will be entitled to receive 1.40 shares of SXC per SXCP unit. SXCP anticipates that the Simplification Transaction will not close prior to the record date for the distribution relating to the first quarter of 2019. In addition, SXCP common unitholders will receive a prorated distribution per unit, payable in SXC common shares and based upon a quarterly distribution of $0.40 per unit, for the period beginning with the first day of the most recent full calendar quarter with respect to which an SXCP unitholder distribution record date has not occurred (or if there is no such full calendar quarter, then beginning with the first day of the partial calendar quarter in which the closing occurs) and ending on the day prior to the close of the merger, as provided in the merger agreement.

Following completion of the Simplification Transaction, SXCP will become a wholly-owned subsidiary of SXC, SXCP's common units will cease to be publicly traded and SXCP's incentive distribution rights will be eliminated. Additionally, SXCP's 7.50% Senior Notes due 2025 will remain outstanding. Completion of the merger is subject to customary closing conditions, including the approval by holders of a majority of the outstanding SXC common shares and SXCP common units, as well as customary regulatory approvals. SXC indirectly owns a sufficient percentage of the SXCP common units to approve the transaction on behalf of the holders of SXCP common units.

**ADVISORS**

Evercore and Baker Botts L.L.P. acted as financial and legal advisors, respectively, to SXC. Citi and Akin Gump Strauss Hauer & Feld LLP acted as financial and legal advisors, respectively, to the conflicts committee of the general partner of SXCP.

**CONFERENCE CALL AND WEBCAST INFORMATION**

SXC will host a live conference call and webcast to discuss the transaction as well as fourth quarter and full year earnings results at

10:00 a.m. Eastern Time (9:00 a.m. Central Time) today, February 5, 2019. A presentation outlining the transaction will be posted on the home page of the "Investors" section of SXC's website, at www.suncoke.com, prior to the call. Investors may participate in this call by dialing 1-833-236-5757 in the U.S. or 1-647-689-4185 if outside the U.S., confirmation code 3165918. The conference call will be archived for replay on a webcast link located in the "Investors" section of www.suncoke.com.

SXCP will host a live conference call and webcast to discuss the transaction as well as fourth quarter and full year earnings results at 12:00 a.m. Eastern Time (11:00 a.m. Central Time) today, February 5, 2019. A presentation outlining the transaction will be posted on the home page of the "Investors" section of SXCP's website, at www.suncoke.com, prior to the call. Investors may participate in this call by dialing 1-833-236-5757 in the U.S. or 1-647-689-4185 if outside the U.S., confirmation code 1497078. The conference call will be archived for replay on a webcast link located in the "Investors" section of www.suncoke.com.

**ABOUT SUNCOKE ENERGY, INC. AND SUNCOKE ENERGY PARTNERS, L.P.**

SunCoke Energy, Inc. (NYSE: SXC) and its sponsored master limited partnership subsidiary, SunCoke Energy Partners, L.P. (NYSE: SXCP), supply high-quality coke used in the blast furnace production of steel, under long-term, take-or-pay contracts that pass through commodity and certain operating costs to customers. We utilize an innovative heat-recovery technology that captures excess heat for steam or electrical power generation. Our cokemaking facilities are located in Illinois, Indiana, Ohio, Virginia and Brazil. We have more than 50 years of cokemaking experience serving the integrated steel industry. Through SXCP, we provide export and domestic material handling services to coke, coal, steel, power and other bulk and liquids customers. Our logistics terminals have the collective capacity to blend and transload more than 40 million tons of material each year and are strategically located to reach Gulf Coast, East Coast, Great Lakes and international ports. To learn more about SunCoke Energy, Inc. and SunCoke Energy Partners, L.P., visit our website at www.suncoke.com.

45. In light of the fact that SunCoke owns 100% of the general partner of SXCP and 61.7% of the outstanding SXCP common units, therefore directly controlling SXCP, the Partnership's Conflicts Committee[13] retained a financial advisor and counsel and interacted with SunCoke without the other members of the SXCP board. The Conflicts Committee consists of two independent directors, John W. Somerhalder II and Martha Z. Carnes. The other five members of the Company's board are executive officers and/or board members of SunCoke.

46. On October 31, 2016, SunCoke announced it had submitted a proposal to the SXCP board to acquire all outstanding common units of SXCP for a purchase price of $17.80, representing a 5% premium. The Conflicts Committee rejected this offer as inadequate and talks of a merger ended on April 20, 2017.

47. On February 5, 2018, the newly elected Chief Executive Officer and President of SunCoke, Michael G. Rippey, discussed with the SunCoke board the possibility of reigniting the merger talks with SXCP. On November 28, 2018, the SunCoke board submitted a new offer to SXCP outlining an exchange ratio of 1.35 new shares of SunCoke common stock for each outstanding SXCP common unit and changed the exchange ratio to 1.40 new shares of SunCoke common stock for each

---

[13] The Partnership is governed by the Board of Directors of the General Partner, of which the Special Committee is a part.

outstanding SXCP common unit on January 22, 2019, representing a 10.4% implied premium.

48. On January 8, 2018, an article was posted to *SeekingAlpha* calling SXCP a good purchase for investors to make, commenting "[m]ost dividend yield stocks come at the expense of growth potential and vice versa. I believe SunCoke Energy Partners LP [] is an opportunity to reap a sustainable 14% distribution yield while still benefiting from significant potential upside to both intrinsic and takeout valuations."[14] The article describes the potential for a SXCP/SunCoke merger and said that SunCoke could pay "up to a 40% premium for SXCP and still drive 10% FCF accretion."[15] The author also states that he believes the October 31, 2016 offer of a 5% premium was in part due to a conflict of interest where the previous Chairman, President and Chief Executive Officer Frederick A. Henderson owned $20 million of SunCoke stock but only $300,000 of SXCP units.

49. Michael G. Rippey, the new Chairman, President and Chief Executive Officer of both SunCoke and the General Partner of SXCP and the Chairman of SXCP, appears to be in a similar position to Frederick A. Henderson. SunCoke's Form DEF 14A filed on March 21, 2018 states that Rippey owns no common units

---

[14] Cornerstone Investors, *SunCoke Energy Partners: 14% Yield and Potential Takeout Makes for a Compelling Buy*, Seeking Alpha (Jan. 8 2018, 10:10 AM), *available at* https://seekingalpha.com/article/4135916-suncoke-energy-partners-14-percent-yield-potential-takeout-makes-compelling-buy.

[15] *Id.*

of SXCP and the right to acquire 221,128 shares of SunCoke common stock worth $1,769,020.[16] Additionally, Rippey has five years to meet the CEO Stock Ownership Guidelines (five times annual base salary), meaning within five years Rippey must own at least $2.25 million in SunCoke stock.

50. Approximately two years ago, when a similar merger transaction was proposed, the independent Conflicts Committee properly exercised its discretion to recommend against the merger. Lead Plaintiff believes that the offer being made by SXC in this case is substantially inferior to the one previously rejected by the Conflicts Committee in 2017, and that it substantially under values SXCP.

51. The S-4/A is materially deficient and violates SEC Regulations G and 14a-9. While touting the fairness of the Merger Consideration to the Partnership's unitholders in the S-4/A, Defendants have failed to disclose certain material information that was necessary for unitholders to properly assess the fairness of the Merger, thereby violating SEC rules and regulations and rendering certain statements in the S-4/A materially incomplete and misleading.

52. In particular, the S-4/A contains materially incomplete and misleading information concerning the financial projections for SXCP and SXC that were prepared by SXC and relied on by Defendants in recommending that SXCP

---

16 *See* SunCoke, Inc., Definitive Proxy Statement (Form DEF 14A) (Mar. 21, 2018), *available at* https://www.sec.gov/Archives/edgar/data/1514705/000119312518090304/d537016ddef14a.htm.

unitholders vote in favor of the Merger. The financial projections were also utilized by SXCP's financial advisor, Citigroup Global Markets Inc. ("Citi"), in conducting certain valuation analyses in support of its fairness opinion.

53. The material omissions and misrepresentations of the projected financial performance of SXCP and SXC bears directly on the valuation of the outstanding common units and the fairness of the Merger Consideration. The previous unsuccessful attempt to take over SXCP and squeeze out minority unitholders in a similar transaction that was rejected by the Conflicts Committee was done at a value of $17.60.

54. In January 2018, analysts had valued SXCP at a value of between $21 and $30 per common unit, far above the Merger Consideration. SC&C has acquired the 61.7% of SXCP unit in the open market at per unit prices in excess of the Merger Consideration in ranges of $17.67 to $18.00. Thus, the Merger Consideration is not fair to SXCP unitholders as it substantially undervalues the Partnership.

55. In sum, it appears that SXCP was well-positioned for financial growth and the Merger Consideration failed to adequately compensate the Partnership's unitholders.

56. Because the false and/or misleading S-4/A was not remedied and the Merger was consummated, Defendants directly and proximately caused damages and actual economic loss (i.e. the difference between the value to be received as a

result of the Merger and the true value of their units prior to the merger), in an amount to be determined at trial, to Lead Plaintiff and the Class.

## II. The Materially Incomplete and Misleading S-4/A

57. On March 8, 2019, in a failed attempt to comply with securities laws requiring full and fair disclosure for unitholders to vote on the Merger, the materially incomplete and misleading S-4 was filed with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act. The materially incomplete and misleading S-4 violates both Regulation G (17 C.F.R. § 244.100) and SEC Rule 14a-9 (17 C.F.R. 240.14a-9), each of which constitutes a violation of Section 14(a) and 20(a) of the Exchange Act. The S-4 has been amended several times, including on April 11, 2019, May 16, 2019 and May 20, 2019, but none of the amendments addressed the violations of Sections 14(a) and 20(a) of the Exchange Act contained in the S-4. The S-4, including the amendments, is referred to as the "S-4/A" or the "Registration Statement." The S-4/A contains the recommendation of the General Partner's Conflicts Committee recommending the Merger to SXCP unitholders. *See* S-4/A 39-44.

58. On April 11, 2019, Defendants caused the S-4/A to be filed with the SEC in connection with the Merger. The S-4/A solicits the Partnership's unitholders to vote in favor of the Merger. Defendants were obligated to carefully review the S-4/A before it was filed with the SEC and disseminated to the Partnership's

unitholders to ensure that it did not contain any material misrepresentations or omissions. However, the S-4/A misrepresents and/or omits material information that was necessary for the Partnership's unitholders to make an informed decision concerning whether to have voted in favor of the Merger, in violation of Sections 14(a) and 20(a) of the Exchange Act.

59. The question of the fair value of SXCP's common units is central to the decision that voters faced, including the members of the Conflicts Committee. As detailed herein, the disclosures ("Disclosures") set forth in the Registration Statement suffer from a number of material omissions that impaired the voters' ability to accurately calculate the value of SCXP's common units. Among others, there were glaring omissions regarding the following important topics:

a. The Registration Statement withheld the unlevered free cash flows of both SXCP and SunCoke; and

b. The Registration Statement failed to provide the information necessary to reconcile SXCP's non-GAAP financial metrics (such as unlevered free cash flows and EBITDA) to pertinent GAAP-based financial metrics underlying the financial projections relied upon by the Partnership's financial advisor.

***Financial Projections that Violate Regulation G and SEC Rule 14a-9***

60. The S-4/A fails to provide material information concerning the SXCP's and SXC's financial projections, which were developed by SXC's management and relied upon by the SXCP board and the Conflicts Committee and the SXC board in recommending that the unitholders vote in favor of the Merger. S-4/A 42. Certain of the financial projections also were relied on by the Partnership's financial advisor, Citi, for purposes different than those for which the SXCP board utilized the financial projections. Citi utilized certain of the financial projections in connection with its valuation analyses and respective fairness opinions. *Id.* at 47-48.

61. The S-4/A contains values for projected non-GAAP (Generally Accepted Accounting Principles) financial metrics from 2019-2023 for: (1) Adjusted EBITDA attributable to SXCP; (2) Distributable Cash Flow; (3) Total Distributed Cash Flow; (4) Standalone SunCoke Adjusted EBITDA; (5) SXCP Distributions; and (6) Cash Available for Dividends, but fails to provide the (i) line items used to calculate these non-GAAP metrics nor (ii) a reconciliation of these non-GAAP projections to the most comparable GAAP measures, in direct violation of Regulation G and consequently Section 14(a). *Id.* at 46.

62. The term "Adjusted EBITDA attributable to SXCP" is defined as a non-GAAP term representing "EBITDA, adjusted for non-recurring items and excluding the impact of transaction costs related to the simplification transaction. Adjusted

EBITDA attributable to SXCP includes 100% interests in Convent Marine Terminal, Kanawha River Terminal, and Lake Terminal, 98.0% interests in Middletown, Haverhill, and Granite City, and SXCP's corporate costs." *Id.* at 47 n.4. However, the S-4/A fails to provide the values of any of these line items and fails to reconcile Adjusted EBITDA to its most comparable GAAP equivalent. *Id.* at 46-47. This omitted information is material because it was used to calculate and project critical projected financial measures utilized by the SXCP board, the Conflicts Committee and Citi to recommend the unfair Merger Consideration, and its omission renders the SXCP board's recommendation, the projected financials, Citi's valuations and the Merger Consideration misleading.

63. The term "Distributable Cash Flow" is described as a non-GAAP term defined as: "Adjusted EBITDA attributable to SXCP, computed as described above, less net cash paid for interest expense, ongoing capital expenditures, accruals for replacement capital expenditures, cash taxes, and adjusted for deferred revenue." *Id.* at 47 n.5. Nevertheless, Defendants again fail to provide the values of any of these line items and fail to reconcile Distributable Cash Flow to its most comparable GAAP equivalent. *Id.* at 46-47. This omitted information is material because it was used to calculate and project critical projected financial measures utilized by the SXCP board, the Conflicts Committee and Citi to recommend the unfair Merger

Consideration, and its omission renders the recommendation, the projected financials, Citi's valuations and the Merger Consideration misleading.

64. The term "Total Distributed Cash Flow" is defined as "Total distributions paid by SXCP to its general partner and limited partners assuming a $0.40 per unit quarterly distribution." *Id.* at 47 n.6. Nevertheless, Defendants again fail to provide the values of any of these line items and fail to reconcile Total Distributed Cash Flow to its most comparable GAAP equivalent. *Id.* at 46-47. This omitted information is material because it was used to calculate and project critical projected financial measures utilized by the SXCP board, the Conflicts Committee and Citi to recommend the unfair Merger Consideration, and its omission renders the recommendation, the projected financials, Citi's valuations and the Merger Consideration misleading.

65. The term "Standalone SunCoke Adjusted EBITDA" is defined as: "Standalone SunCoke Adjusted EBITDA is a non-GAAP measure of financial performance. Adjusted EBITDA represents earnings before interest, taxes, depreciation and amortization ("EBITDA"), adjusted for non-recurring items and excluding the impact of transaction costs related to the simplification transaction. Standalone SunCoke Adjusted EBITDA refers to adjusted EBITDA attributable to SunCoke excluding GP/LP distributions from SXCP and cash distributions made by Indiana Harbor in respect of non-controlling interests and related capital expenditure

reimbursements, and includes SunCoke's 100% interests in Jewell Coke, Brazil, and Dismal River Terminal, 85.2% interest in Indiana Harbor, 2% interests in Middletown, Haverhill, and Granite City, and SunCoke's corporate and other costs." *Id.* at 46 n.1. Nevertheless, Defendants again fail to provide the values of any of these line items and fail to reconcile Standalone SunCoke Adjusted EBITDA to its most comparable GAAP equivalent. *Id.* at 46-47. This omitted information is material because it was used to calculate and project critical projected financial measures utilized by the SXC board, the SXCP board, the Conflicts Committee and Citi to recommend the unfair Merger Consideration, and its omission renders the recommendation, the projected financials, Citi's valuations and the Merger Consideration misleading.

66. The term "SXCP Distributions" is defined as "SunCoke's GP/LP distributions from SXCP." *Id.* at 46 n.2. Defendants fail to provide the values of any of this item and fail to reconcile SXCP Distributions to its most comparable GAAP equivalent. *Id.* at 46-47. This omitted information is material because it was used to calculate and project critical projected financial measures utilized by the SXC board, the SXCP board, the Conflicts Committee and Citi to recommend the unfair Merger Consideration, and its omission renders the recommendation, the projected financials, Citi's valuations and the Merger Consideration misleading.

67. The term "Cash Available for Dividends – Adjusted" is defined as: "Cash Available for Dividends – Adjusted is a non-GAAP measure of financial performance and is defined as Standalone SunCoke Adjusted EBITDA, computed as described above, less standalone maintenance capital expenditures, interest expense, cash taxes, and excluding certain noncash items. Adjustment includes adding back one-time oven rebuild costs at Indiana Harbor ($40 million of capital expenditures and $10 million of operating expenses) in 2019." *Id.* at 46 n.3. This omitted information is material because it was used to calculate and project critical projected financial measures utilized by the SXC board, the SXCP board, the Conflicts Committee and Citi to recommend the unfair Merger Consideration, and its omission renders the recommendation, the projected financials, Citi's valuations and the Merger Consideration misleading.

68. When a company (or any entity bound by the disclosure requirements of the Exchange Act) discloses non-GAAP financial measures in a registration statement that were relied on by a board of directors to recommend that unitholders exercise their corporate suffrage rights in a particular manner, the company must, pursuant to SEC regulatory mandates, also disclose all projections and information necessary to make the non-GAAP measures not misleading, and must provide a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with the

most comparable financial measure or measures calculated and presented in accordance with GAAP. 17 C.F.R. § 244.100.

69. Indeed, the SEC has scrutinized the use of non-GAAP financial measures in communications with shareholders. Former SEC Chairwoman Mary Jo White has stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as SXCP included in the S-4/A here), implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation. Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors. And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data. I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures. I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[17]

70. The SEC has acknowledged that potential "misleading inferences" are

---

[17] Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), *available at* https://www.sec.gov/news/speech/chair-white-icgn-speech.html (emphasis added) (footnotes omitted).

exacerbated when the disclosed information contains non-GAAP financial measures[18] and adopted Regulation G[19] "to ensure that investors and others are not misled by the use of non-GAAP financial measures."[20]

71. Defendants must comply with Regulation G. More specifically, Defendants must disclose the most directly comparable GAAP financial measure and a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP. 17 C.F.R. § 244.100. This is because the SEC believes "this reconciliation will help investors . . . to better evaluate the non-GAAP financial measures . . . . [and] more accurately evaluate companies' securities and, in turn, result in a more accurate pricing of securities."[21]

72. The SEC has required compliance with Regulation G, including reconciliation requirements in other merger transactions. *Compare Youku Tudou*

---

[18] Non-GAAP financial measures are numerical measures of future financial performance that exclude amounts or are adjusted to effectively exclude amounts that are included in the most directly comparable GAAP measure. 17 C.F.R. § 244.101(a)(1).

[19] Item 10 of Regulations S-K and S-B were amended to reflect the requirements of Regulation G.

[20] SEC, *Final Rule: Conditions for Use of Non-GAAP Financial Measures* (Jan 22, 2003), *available at* https://www.sec.gov/rules/final/33-8176.htm ("SEC, *Final Rule*").

[21] SEC, *Final Rule.*

*Inc., et al.*, Correspondence 5 (Jan. 11, 2016) (Issuer arguing that Rule 100(d) of Regulation G does not apply to non-GAAP financials relating to a business combination),[22] with *Youku Tudou Inc., et al.*, SEC Staff Comment Letter 1 (Jan. 20, 2016) ("[The SEC] note[s] that your disclosure of projected financial information is not in response to the requirements of, or pursuant to, Item 1015 of Regulation M-A and is thus not excepted from Rule 100 of Regulation G.");[23] *see Harbin Electric, Inc.*, Correspondence 29 (Aug. 12, 2011) ("Pursuant to the requirements of Regulation G, we have added a reconciliation of actual and projected EBIT to GAAP net income . . . .").[24]

73. Compliance with Regulation G is mandatory under Section 14(a), and

---

[22] *Available at* https://www.sec.gov/Archives/edgar/data/1442596/0001104659 16089133/filename1.htm.

[23] *Available at* https://www.sec.gov/Archives/edgar/data/1442596/0000000000 16062042/filename1.pdf.

[24] *Available at* https://www.sec.gov/Archives/edgar/data/1266719/0001144 20411046281/filename1.htm. *See also Actel Corporation*, SEC Staff Comment Letter 2 (Oct. 13, 2010) ("Opinion of Actel's Financial Advisor, page 24 . . . This section includes non-GAAP financial measures. Please revise to provide the disclosure required by Rule 100 of Regulation G."), *available at* https://www.sec.gov/Archives/edgar/data/907687/000000000010060087/filename1 .pdf. *See also The Spectranetics Corp.*, SEC Staff Comment Letter 1 (July 18, 2017) ("Item 4. The Solicitation or Recommendation Certain Spectranetics Forecasts, page 39 . . . [P]rovide the reconciliation required under Rule 100(a) of Regulation G"), *available at* https://www.sec.gov/Archives/edgar/data/789132/0000000000170251 80/filename1.pdf. The SEC Office of Mergers and Acquisitions applied Regulation G in these transactions and that reflects the SEC's official position. Any claim that the SEC has officially sanctioned the use of non-GAAP financial forecasts for business combinations when the Board itself created and relied on such non-GAAP forecasts to recommend a transaction such as the Merger is incorrect. The SEC's

non-compliance constitutes a violation of Section 14(a). Thus, in order to bring the S-4/A into compliance with Regulation G as well as cure the materially misleading nature of the projections under SEC Rule 14a-9 as a result of the omitted information, Defendants must provide a reconciliation table of the non-GAAP measures to the most comparable GAAP measures and/or disclose the line item projections for the financial metrics that were used to calculate the aforementioned non-GAAP measures. Such projections are necessary to make the non-GAAP projections included in the S-4/A not misleading.

***The Materially Misleading Financial Analyses***

74. The financial projections at issue were relied upon by the Partnership's financial advisor, Citi, in connection with its valuation analyses and respective fairness opinions. S-4/A 47-48. The opacity concerning the Partnership's internal projections renders the valuation analyses described below materially incomplete and misleading, particularly as companies formulate non-GAAP metrics differently. Once a registration statement discloses internal projections relied upon by the board, those projections must be complete and accurate.

---

website provides certain unofficial guidance for certain matters, called Compliance and Disclosure Interpretations ("C&DI's") which through the use of Q&As reflect the views of particular SEC staff and on which certain issuers have in the past claimed an exemption from Regulation G. The SEC itself expressly disclaims C&DI's as they are not regulations that have been reviewed by the SEC, and the SEC expressly states that they are not binding and should not be relied on. *See* www.sec.gov/divisions/corpfin/cfguidance.shtml.

75. The market values of the Merger Consideration implied by SunCoke's closing stock prices as of selected dates were:

a. $14.15 per unit, based on SunCoke's closing price of $10.11 per share on February 5, 2019 (the date the Merger was announced);

b. $12.20 per unit, based on SunCoke's closing price of $8.72 per share on April 11, 2019 (the date the Registration Statement was filed with the SEC); and

c. $10.80 per unit, based on SunCoke's closing price of $7.69 per share on June 12, 2019

76. With respect to Citi's *Discounted Cash Flow Analysis*, the S-4/A states that Citi calculated "the estimated present value of the unlevered free cash flows that SXCP was forecasted to generate during the fiscal years ending December 31, 2019 through December 31, 2023 based on the SXCP forecasts." *Id.* at 54. Despite disclosing that the unlevered after-tax free cash flow projections were based on the Partnership's financial projections, the S-4/A fails to disclose the actual unlevered after-tax free cash flow or the values of the line items utilized to calculate unlevered after-tax free cash flow. The absence of this information renders Citi's discounted cash flow analysis incomplete and misleading.

77. Citi additionally used a terminal Adjusted EBITDA multiple of 5.7x to 7x and a discount rate of 8.3% to 9.8% for which there is no stated reason as to why those ranges were chosen. *Id.* at 53-54.

78. The definition of projected after-tax unlevered free cash flow ("UFCF") is, in and of itself, and separate and apart from the mandates of Regulation G, materially false and/or misleading in violation of SEC Rule 14a-9 (17 C.F.R. 240.14a-9). Because neither the method nor the line items used to calculate projected after-tax UFCF were disclosed, unitholders were unable to discern the veracity of Citi's discounted cash flow analysis. Without further disclosure, unitholders were unable to compare Citi's calculations with the Partnership's financial projections. Thus, the Partnership's unitholders were materially misled regarding the value of the Partnership.

79. These key inputs were material to SXCP unitholders, and their omission rendered the summary of Citi's discounted cash flow analysis incomplete and misleading. As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's projections and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006). Such choices

include "the appropriate discount rate, and the terminal value . . . ." *Id.* (footnote omitted). As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value . . . The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions[.]

*Id.* at 1577-78 (footnotes omitted).

80. These omissions from the *Discounted Cash Flow Analysis* are all the more misleading because the equity value ranges Citi calculated fall below the Merger Consideration. On April 10, 2019, SunCoke's stock closed at $9.04 per share. Using the exchange rate of 1.40 shares per unit of SXCP, the Merger Consideration is valued at $12.66. Citi's *Discounted Cash Flow Analysis* estimated the implied per unit equity value of SXCP to be $14.10 to $19.60. Furthermore, on April 10, 2019, SXCP's units closed at $13.12 per unit. Therefore, in order for SXCP unitholders to become fully informed regarding the fairness of the Merger Consideration, the material omitted information must have been disclosed to unitholders.

81. "In connection with the proposed Merger, management of SunCoke prepared non-public projections relating to the future financial and operating performance of SunCoke and SXCP with respect to the fiscal years ending December 31, 2019 through 2023." *See* S-4/A 44; *see also id.* at 20. This

information is indisputably material due to the astounding conflicts of interest that SXC concedes in the S-4/A by disclosing that the SXCP's (the Target's) internal projections were created by employees of SXC (the Buyer). Some unknown form of these projections were provided to the Conflicts Committee to use in deciding how to vote, but only summaries prepared by SXC were provided in the Registration Statement. Whatever kind of projections were provided to the Conflicts Committee, no matter how incomplete they may have been, they would have been material and should have been disclosed completely in the Registration Statement.

82. With respect to Citi's *Implied Exchange Ratio Reference Range* calculations (*id.* at 51-55), there appears to be an inconsistency in Citi's comparison of the values of SXCP and SunCoke, respectively. For example, based on its *Selected Public Companies Analysis*, Citi calculated a broad overall range of SXCP-to-SunCoke values of 0.627x – 1.382x, calculated as follows:

a. 0.627 = $9.15 (SXCP's lowest indicated value) ÷ $14.60 (SunCoke's highest indicated value)

b. 1.382 = $15.00 (SXCP's highest indicated value) ÷ $10.85 (SunCoke's lowest indicated value).

83. The problem with the above calculations is that SunCoke's value is largely a function of its holdings of the SXCP's units. As such, the lowest indication of SunCoke's value requires the lowest indication of SXCP's value, while the

highest indication of SunCoke's value requires the highest indication of SXCP's value. But the ratio in (a) above requires the value of SXCP to simultaneously be at both its minimum (for the numerator) and its maximum (for the denominator). The ratio in (b) above has the same nonsensical requirement, although in this instance the maximum value of SXCP goes to the numerator while the minimum value of SXCP simultaneously goes to the denominator. The same problem of inconsistency plagues the corresponding calculations of the *Implied Exchange Ratio Reference Range* shown in Citi's *Discounted Net Cash Flow Analyses*. The information contained in the Registration Statement is of insufficient granularity to have enabled SXCP's unitholders to correct Citi's error.

84. At least two of the analyses underlying Citi's fairness opinion strongly suggest that the Merger Consideration was inadequate.

85. First, the implied market value of the Merger Consideration had dropped to $12.72 as of the date the Registration Statement was filed with the SEC. This lies below the entire range of $14.10 to $19.60 per unit indicated by Citi's *Discounted Cash Flow Analyses*. *Id.* at 54. Second, the Wall Street analyst price targets examined by Citi ranged from $14.00 to as high as $20.00, with a median figure of $19.50 per unit. *Id.* at 55. The fact that Citi's own financial analyses raised doubts about the adequacy of the Merger Consideration once again indicates the

importance of providing SXCP's unitholders with the information necessary to independently assess the value of both SXCP and SunCoke.

86. In sum, the S-4/A independently violates both: (i) Regulation G, which requires a presentation and reconciliation of any non-GAAP financial to their most directly comparable GAAP equivalent; and (ii) Rule 14a-9, since the material omitted information renders certain statements, discussed above, materially incomplete and misleading. As the S-4/A independently contravenes the SEC rules and regulations, Defendants violated Section 14(a) and Section 20(a) of the Exchange Act by filing the S-4/A to garner votes in support of the Merger from SXCP unitholders.

87. Absent disclosure of the foregoing material information prior to the special unitholder meeting to vote on the Merger, Lead Plaintiff and the other members of the Class were not able to make a fully-informed decision regarding whether to vote in favor of the Merger, and they were thus threatened with irreparable harm.

88. Further, the failure to remedy the deficient Registration Statement and having consummated the Merger directly and proximately caused damages and actual economic loss to unitholders (*i.e.* the difference between the value to be received as a result of the Merger and the true value of their units prior to the merger), in an amount to be determined at trial, to Lead Plaintiff and the Class.

89. The SXCP Conflicts Committee recommended the Merger based in part on its review of the Partnership's projected financial measures, only a summarized portion of which is included in the Disclosures set forth in the S-4/A.[25] The Financial Forecasts provided to SXCP's unitholders constitute only a *summary* of the unabridged projections available to SunCoke:

> The *summary of these projections* is included below because *these projections* were made available to the SXCP Conflicts Committee, the SXCP Board, the SunCoke Board and their respective financial advisors in connection with the proposed Merger.[26]

90. SunCoke (the Buyer) prepared not only its own financial projections but also the financial projections of SXCP (the Target), thereby creating a conflict of interests that heightens the need for thorough disclosure:

> In connection with the proposed Merger, management of SunCoke prepared non-public projections relating to the future financial and operating performance of SunCoke and SXCP with respect to the fiscal years ending December 31, 2019 through 2023.[27]

91. The unabridged financial projections constitute material information, and their absence from the Registration Statement is therefore a material shortcoming.

92. The market values of the Merger Consideration implied by SunCoke's closing stock prices as of selected dates were:

---

25 *Id.* at 41, 51.
26 *Id.* at 44 (emphases added).
27 *Id.*

a. $14.15 per unit, based on SunCoke's closing price of $10.11 per share on February 5, 2019 (the date the Merger was announced);

b. $12.72 per unit, based on SunCoke's closing price of $8.72 per share on April 11, 2019 (the date the Registration Statement was filed with the SEC); and

c. $10.64 per unit, based on SunCoke's closing price of $7.60 per share on May 29, 2019.

93. The question of the fair value of SXCP's common units is central to the decision facing voters, including the members of the Conflicts Committee. As detailed herein, the Disclosures set forth in the Registration Statement suffer from a number of material omissions regarding the following important topics:

a. The Registration Statement withheld the unlevered free cash flows of both SXCP and SunCoke; and

b. The Registration Statement failed to provide the information necessary to reconcile SXCP's non-GAAP financial metrics (such as unlevered free cash flows and EBITDA) to pertinent GAAP-based financial metrics underlying the financial projections relied upon by the Partnership's financial advisor.

94. The failure to disclose this information was inappropriate and this information would have afforded a far clearer indication with respect to the

Partnership's value and allow unitholders to form a more educated opinion of the merits of the Merger. These omissions constitute a material shortcoming in the disclosures made because this omitted information was material information.

**Citi's Fairness Analysis is Flawed, Poorly Explained and of Dubious Utility to SXCP's Unitholders**

95. The description of Citi's fairness analysis appearing on pages 47 through 56 of the Registration Statement is problematic for at least two reasons. It suggests an irregularity in Citi's *Implied Exchange Ratio Reference Range* calculations. It also contains information that calls into question Citi's conclusion of the fairness of the Merger, from a financial point of view, to SXCP's unitholders.

96. The irregularity in Citi's *Implied Exchange Ratio Reference Range* calculations results from an apparent inconsistency in Citi's comparison of the values of SXCP and SunCoke, respectively. For example, based on its *Selected Public Companies Analysis*, Citi calculated a broad overall range of SXCP-to-SunCoke values of 0.627x – 1.382x, calculated as follows:

a. 0.627 = $9.15 (SXCP's lowest indicated value) ÷ $14.60 (SunCoke's highest indicated value)

b. 1.382 = $15.00 (SXCP's highest indicated value) ÷ $10.85 (SunCoke's lowest indicated value).

97. The problem with the above calculations is that SunCoke's value is largely a function of its holdings of the SXCP's units. As such, the lowest indication

of SunCoke's value requires the lowest indication of SXCP's value, while the highest indication of SunCoke's value requires the highest indication of SXCP's value. But the ratio in (a) above requires the value of SXCP to simultaneously be at both its minimum (for the numerator) and its maximum (for the denominator). The ratio in (b) above has the same nonsensical requirement, although in this instance the maximum value of SXCP goes to the numerator while the minimum value of SXCP simultaneously goes to the denominator. The same problem of inconsistency plagues the corresponding calculations of the *Implied Exchange Ratio Reference Range* shown in Citi's *Discounted Net Cash Flow Analyses*. The information contained in the Registration Statement is of insufficient granularity to have enabled SXCP's unitholders to correct Citi's error.

98. Furthermore, the description of the fair value of SunCoke's asset EBITDA is inaccurate and confusing, and almost certainly the result of a drafting error in the Registration Statement.

99. Furthermore, at least two of the analyses underlying Citi's fairness opinion strongly suggest that the Merger Consideration was inadequate.

100. As previously noted, the implied market value of the Merger Consideration had dropped to $12.20 as of the date the Registration Statement was filed with the SEC (and further to approximately $10.80 on June 12, 2019). This lies below the entire range of $14.10 to $19.60 per unit indicated by Citi's

*Discounted Cash Flow Analyses*.[28] Similarly, the Wall Street analyst price targets examined by Citi ranged from $14.00 to as high as $20.00, with a median figure of $19.50 per unit.[29] The fact that Citi's own financial analyses raise doubts about the adequacy of the Merger Consideration indicates the importance of having provided SXCP's unitholders with the information necessary to have independently assessed the value of both SXCP and SunCoke.

**The Importance of Providing Sufficient Information to Shareholders to Enable an Adequately Informed Decision is Axiomatic**

101. It is axiomatic that unitholders should be informed about the merits (or lack thereof) with respect to any transaction for which their approval is sought. Indeed, Defendants themselves had acknowledged as much in the Registration Statement by admonishing unitholders to reach a full understanding of the financial analyses underlying Citi's Fairness Opinion:

> **In order to fully understand the financial analyses, the tables must be read together with the text of each summary as the tables alone do not constitute a complete description of the financial analyses.**[30]

102. The Registration Statement further acknowledged the potential of the information pertaining to Citi's analysis to be misleading if all analyses and factors were not considered:

---

28 Registration Statement 54.
29 *Id.* at 55.
30 *Id.* at 50 (emphasis added).

> **Considering the data in the tables below without considering the full narrative description of the financial analyses, including the methodologies and assumptions underlying the financial analyses, could create a misleading or incomplete view of such financial analyses.**[31]

103. As discussed hereinafter, however, the Disclosures failed to provide adequate information to investors – particularly with respect to (i) unlevered free cash flows of SXCP and SunCoke, and (ii) the important information necessary to reconcile projected non-GAAP financial measures to their most directly comparable GAAP-based counterparts.

### The Disclosures Failed to Disclose the Unlevered Free Cash Flows Necessary to Calculate the Values of Both SXCP and SunCoke

#### ***Primacy of Discounted Cash Flow Analysis***

104. As an initial matter, it is important to understand that the discounted cash flow ("DCF") analysis has primacy among corporate valuation techniques. This particular analysis, in fact, forms the basis for all other valuation techniques

---

[31] *Id.* at 51 (emphasis added).

and is the very core of modern corporate finance.[32, 33, 34] Both academicians and practitioners alike acknowledge this principle.

105. Because DCF analyses are of such fundamental importance in the determination of corporate value, it follows that the propriety of the financial projections used to create the DCF analysis in the fairness presentation prepared by SXCP's financial advisor (which was relied upon by the Conflicts Committee of the General Partner's board of directors in making its recommendation to unitholders) is commensurately important. This information would have enabled SXCP's unitholders to independently prepare DCF analyses for SXCP and SunCoke, as well as to assess the merit of Citi's analysis, and therefore the weight (if any) to place on

---

[32] "Discounted cash flow (DCF) forms the core of finance . . . . Though professionals may employ other methods of valuation, such as relative valuation and the contingent claims approach, DCF forms the basis for all other valuations. Underscoring the importance of DCF valuation is the fact that it provides a linchpin to link various fields of finance." *See* "Developing an Automated Discounted Cash Flow Model." *The Valuation Handbook: Valuation Techniques from Today's Top Practitioners* ("The Valuation Handbook") 110 (Rawley Thomas and Benton E. Gup. Hoboken: John Wiley & Sons ed.) (2010).

[33] "While discounted cash flow valuation is only one of the three ways of approaching valuation and most valuations done in the real world are relative valuations, it is the foundation on which all other valuation approaches are built. To do relative valuation correctly, we need to understand the fundamentals of discounted cash flow valuation. This is why so much of this book focuses on discount cash flow valuation." Damodaran & Aswath, "Approaches to Valuation," *Investment Valuation* 11 (2nd ed.).

[34] "In finance theory, present value models [also referred to as discounted cash flow models] are considered the fundamental approach to equity valuation." CFA® Program Curriculum 2015, Level II, "Volume 4: Equity" CFA Institute 22 (2014).

Citi's conclusions.

106. The unique vantage point from which it is able to ascertain the future outlook for the operations of the business makes management's assessment of a company's future operating and financial performance all but irreplaceable in most instances. For this reason, thorough disclosure with respect to the projected cash flows required to prepare a DCF analysis (including the manner in which such cash flows were calculated) is a staple in the vast majority of proxy statements filed by publicly traded companies being acquired in corporate mergers.

107. Defendants themselves explicitly acknowledged the importance of future cash flows to the Merger generally, indicating that "[t]he failure of SXCP's or SunCoke's businesses to achieve projected results, including projected cash flows, could have a material adverse effect on the price of SunCoke Common Stock, SunCoke's financial position and SunCoke's ability to reinstate, maintain or increase its dividends following the Merger."[35]

108. In contrast to normal practice, however, the Disclosures inappropriately excluded the projected unlevered free cash flows of both SXCP and SunCoke used in Citi's *Discounted Cash Flow Analyses*.[36] Instead the financial forecasts in the Registration Statement included only the following financial metrics, neither of

---

[35] S-4/A 20.

[36] *Id.* at 54-55.

which is a substitute for the unlevered free cash flow required to perform DCF analyses of SXCP and SunCoke:[37]

a. For SXCP: Adjusted EBITDA attributable to SXCP, Distributable Cash Flow, and Total Distributed Cash Flow; and

b. For SunCoke: Adjusted EBITDA, SXCP Distributions, and Cash Available for Dividends.

**Figure 1: Registration Statement Omits Material Information Necessary to Value SXCP and SunCoke**

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2019 | 2020 | 2021 | 2022 | 2023 |
| | (Dollars in millions) | | | | |
| SunCoke: | | | | | |
| Standalone SunCoke Adjusted EBITDA (1) | $ 47 | $ 69 | $ 67 | $ 70 | $ 65 |
| SXCP Distributions (2) | $ 47 | $ 47 | $ 47 | $ 47 | $ 47 |
| Cash Available for Dividends – Adjusted (3) | $ 84 | $ 93 | $ 79 | $ 63 | $ 67 |
| SXCP: | | | | | |
| Adjusted EBITDA attributable to SXCP (4) | $219 | $227 | $232 | $237 | $217 |
| Distributable Cash Flow (5) | $100 | $104 | $106 | $129 | $114 |
| Total Distributed Cash Flow (6) | $ 75 | $ 75 | $ 75 | $ 75 | $ 75 |

(1) Standalone SunCoke Adjusted EBITDA is a non-GAAP measure of financial performance. Adjusted EBITDA represents earnings before interest, taxes, depreciation and amortization ("EBITDA"), adjusted for non-recurring items and excluding the impact of transaction costs related to the simplification transaction. Standalone SunCoke Adjusted EBITDA refers to adjusted EBITDA attributable to SunCoke excluding GP/LP distributions from SXCP and cash distributions made by Indiana Harbor in respect of non-controlling interests and related capital expenditure reimbursements, and includes SunCoke's 100% interests in Jewell Coke, Brazil, and Dismal River Terminal, 85.2% interest in Indiana Harbor, 2% interests in Middletown, Haverhill, and Granite City, and SunCoke's corporate and other costs.

(2) SunCoke's GP/LP distributions from SXCP.

(3) Cash Available for Dividends – Adjusted is a non-GAAP measure of financial performance and is defined as Standalone SunCoke Adjusted EBITDA, computed as described above, less standalone maintenance capital expenditures, interest expense, cash taxes, and excluding certain noncash items. Adjustment includes adding back one-time oven rebuild costs at Indiana Harbor ($40 million of capital expenditures and $10 million of operating expenses) in 2019.

(4) Adjusted EBITDA attributable to SXCP is a non-GAAP measure of financial performance. Adjusted EBITDA represents EBITDA, adjusted for non-recurring items and excluding the impact of transaction costs related to the simplification transaction. Adjusted EBITDA attributable to SXCP includes 100% interests in Convent Marine Terminal, Kanawha River Terminal, and Lake Terminal, 98.0% interests in Middletown, Haverhill, and Granite City, and SXCP's corporate costs.

(5) Distributable Cash Flow is a non-GAAP measure of financial performance and is defined as Adjusted EBITDA attributable to SXCP, computed as described above, less net cash paid for interest expense, ongoing capital expenditures, accruals for replacement capital expenditures, cash taxes, and adjusted for deferred revenue.

(6) Total distributions paid by SXCP to its general partner and limited partners assuming a $0.40 per unit quarterly distribution.

109. Although the importance of omitting SXCP's unlevered free cash flows was perhaps self-evident since this information was necessary to perform a DCF analysis of the Partnership, the omission of SunCoke's unlevered free cash flows

---

37 *Id.* at 46.

was equally problematic in this instance. This is true because all of the Merger Consideration paid to the Partnership's unitholders consisted of SunCoke common stock, which must also have been valued. Accordingly, it was important for SXCP's unitholders to have been made aware of the pertinent information necessary to determine the worth of SunCoke.

110. Generally speaking, if an acquirer's stock is deemed by the target's unitholders to be overvalued, such acquirer stock will tend to be perceived, *cet. par.*, as less favorable than would otherwise be the case (and vice-versa). As such, it is as important for SXCP's unitholders to examine and understand the value of the consideration they stood to *receive* (i.e., SunCoke common stock) as the value of what they were being asked to *sell* (i.e., their units of the Partnership).

111. For its own DCF analyses of SXCP and SunCoke, Citi utilized management-prepared financial forecasts that:

> Citi was directed to utilize in its analyses, [and] was advised by the managements of SXCP General Partner and SunCoke, and Citi assumed, with the SXCP Conflicts Committee's consent, that they were reasonably prepared on bases reflecting the best currently available estimates and judgments of such managements, as applicable, as to, and were a reasonable basis upon which to evaluate, the future financial performance of SXCP and SunCoke, the potential strategic implications and financial and operational benefits (including the amount, timing and achievability thereof) anticipated by the management of SunCoke to result from, and other potential pro forma financial effects of, the Merger and the other matters covered thereby. Citi expressed no view or opinion as to any financial forecasts and other information or data (or underlying assumptions on which any such financial forecasts and other information or data are based) provided to

> or otherwise reviewed by or discussed with Citi and Citi assumed, with the SXCP Conflicts Committee's consent, that the financial results, including with respect to the potential strategic implications and financial and operational benefits anticipated to result from the Merger, reflected in such financial forecasts and other information and data would be realized in the amounts and at the times projected.[38]

112. Furthermore, Citi failed to specify how it calculated unlevered free cash flow for SXCP and SunCoke, or even whether the same formula was used for both companies.

***<u>None of (a) Distributions, (b) Cash Available for Dividends, (c) Distributable Cash Flow, or (d) Total Distributed Cash Flow Are Equivalent to Unlevered Free Cash Flow</u>***

113. Whether individually or in combination, none of the above financial measures presented for SXCP and SunCoke in the financial forecasts is a substitute for unlevered free cash flow when preparing a DCF analysis. Rather, these measures were each calculated on a *levered* basis (i.e., with a deduction for interest expense). The cash flow figures used by Citi in its *Discounted Cash Flow Analyses* were calculated on an *unlevered* basis (i.e., unaffected by the presence or absence of interest-bearing debt).

114. Because interest expense is deducted from *levered* cash flows, but not *unlevered* cash flows, the *levered* figures included in the financial forecasts for (a) Distributions, (b) Cash Available for Dividends, (c) Distributable Cash Flow, or (d)

---

[38] *Id.* at 48.

Total Distributed Cash Flow all likely understate projected *unlevered* free cash flows used by Citi and necessary for SXCP's unitholders to have performed a proper DCF analyses for the Partnership and SunCoke.

115. The use of *unlevered* free cash flows is the most common method used in corporate valuation, and is appropriate for SXCP and SunCoke as evidenced by the fact that *unlevered* DCF models were used by both Citi and Evercore Group L.L.C. ("Evercore")[39] (SunCoke's financial advisor) in their respective fairness opinions.

116. Because it precludes SXCP's unitholders from having been able to have independently assessed both the Partnership's value and SunCoke's value using the single-most meaningful valuation method – DCF analysis – the projected unlevered free cash flows were of such singular importance that this omission alone constituted a material shortcoming in the total mix of information made available to SXCP's unitholders.

***<u>EBITDA and Other Projected Financial Measures Are Not a Substitute for Unlevered Free Cash Flow</u>***

117. Because EBITDA is another metric sometimes misunderstood to be equivalent to unlevered free cash flow, it is important to emphasize that the two are

[39] The Registration Statement indicates that the discount rate used by Evercore was based on a weighted-average cost of capital, which is consistent with an *unlevered* DCF model. *See id.* 61.

not the same and must not be treated as if they are. Shannon Pratt, a longtime valuation practitioner and author, points out "this error is not a minor matter."[40]

118. While EBITDA is widely used by financial analysts and can be useful in the appropriate context, the valuation community recognizes that the metric has its shortcomings and limitations and should not be overemphasized when other important financial information is available. According to The Valuation Handbook:

> EBITDA can be a useful measure to assess a company's performance, [but] has a number of shortcomings that should not be ignored when using it, including, but not limited to, the following:
>
> - EBITDA represents debt-free firms, which is not the case for most companies . . . .
> - EBITDA also ignores tax payments, which profitable firms cannot, or cannot always, avoid . . . .
> - It does not take into account firms with different capital investments and the depreciation that comes with them . . . .

---

40 "Occasionally, we find an analyst treating earnings before interest, taxes, depreciation, and amortization (EBITDA) as if it were free cash flow. This error is not a minor matter . . . ." Shannon Pratt, "Net Cash Flow: The Preferred Measure of Return," *Cost of Capital* 16 (2008).

- EBITDA does not exclude all noncash items such as the allowance for bad debts and inventory write-downs as well as the impact of investments in working capital . . . .[41]

119. The wider investment community, as well, has likewise learned to use caution when considering EBITDA. While acknowledging its merits when used appropriately, Moody's Investors Service has long warned against overreliance on EBITDA. In a 23-page *Special Comment* dated June 2000, Moody's indicated:

> We find the ten critical failings of using EBITDA to be the following:
>
> 1. EBITDA ignores changes in working capital and overstates cash flow in periods of working capital growth
> 2. EBITDA can be a misleading measure of liquidity
> 3. EBITDA does not consider the amount of required reinvestment – especially for companies with short lived assets
> 4. EBITDA says nothing about the quality of earnings
> 5. EBITDA is an inadequate standalone measure for comparing acquisition multiples
> 6. EBITDA ignores distinctions in the quality of cash flow resulting from differing accounting policies – NOT all revenues are cash

41 The Valuation Handbook 529-30.

7. EBITDA is not a common denominator for cross- border accounting conventions
8. EBITDA offers limited protection when used in indenture covenants
9. EBITDA can drift from the realm of reality
10. EBITDA is not well suited for the analysis of many industries because it ignores their unique attributes.[42]

120. Elsewhere in the same *Special Comment*, Moody's noted that knowledge of the limitations of EBITDA was commonplace, indicating that "[b]y all appearances, most corporate managers are aware of the limitations of EBITDA. In varying language, many financial statements contain warnings regarding the use of EBITDA."[43]

121. Already on record regarding the issue, Moody's again urged caution in 2014, when it explained that "calculating EBITDA can be open to interpretation[,]" that "EBITDA may be calculated aggressively to portray a more favorable credit profile[,]" and that "issuers can have a tendency to more aggressively calculate EBITDA to improve their credit metrics and facilitate market access." Perhaps most pointedly, one of the concluding remarks of the 2014 Special Comment was that

---

[42] Moody's Investors Service, *Special Comment* entitled *Putting EBITDA In Perspective: Ten Critical Failings of EBITDA as the Principal Determinant of Cash Flow* ("*Special Comment*") 1 (June 2000), *available at* https://ucema.edu.ar /u/jd/Inversiones/Articulos/Moodys_Putting_Ebitda_into_perspective.pdf.

[43] *Id.* at 3.

"EBITDA cannot be taken at face value and generally should be evaluated alongside other liquidity and cash metrics."[44]

122. Therefore, the S-4/A should have disclosed how Citi calculated the unlevered free cash flows of both SXCP and SunCoke, and provided the calculated unlevered free cash flow values including the line items used to calculate it for both SXCP and SXC.

**Despite Acknowledging the Important Distinction Between Non-GAAP and GAAP Financial Metrics, Defendants Failed to Provide the Necessary Reconciliation**

123. The importance of reconciling between non-GAAP and GAAP financial measures is (and has long been) widely acknowledged. The SEC adopted "Regulation G" in 2003, in response to the mandate set forth in Section 401(b) of the Sarbanes-Oxley Act that rules be enacted to regulate the use of pro forma financial information. Regulation G states that when a publicly-traded partnership, such as SXCP, discloses material information that includes non-GAAP financial measures, the partnership also must include the most directly comparable GAAP financial measure, as well as a reconciliation of the two. 17 C.F.R. §244.100(a). Such reconciliations were deemed necessary to address the proliferation of non-

44 Moody's Investors Service, *Special Comment* entitled *EBITDA: Used and Abused* 1, 5 & 8 (Nov. 20, 2014), *available at* http://www.shareholderforum .com/access/Library/20141120_Moodys.pdf..

GAAP financial measures lacking a uniform definition and therefore carrying the risk of misleading investors.

124. Defendants themselves emphasized in SXCP's quarterly earnings releases (the most recent of which contains five pages of reconciliations between non-GAAP and GAAP financial measures[45]) the importance of distinguishing between non-GAAP and GAAP financial metrics. In fact, SXCP's definition of Adjusted EBITDA contains not one but two references alerting unitholders to the facts that:

> Adjusted EBITDA does not represent and should not be considered an alternative to net income or operating income under accounting principles generally accepted in the U.S. . . . and may not be comparable to other similarly titled measures in other businesses.[46]
>
> EBITDA and Adjusted EBITDA are not measures calculated in accordance with GAAP, and they should not be considered an alternative to net income, operating cash flow or any other measure of financial performance presented in accordance with GAAP.[47]

125. Substantially identical language appears in SunCoke's quarterly earnings releases.[48] SunCoke's earnings releases also contain reconciliations

---

45 *See* SXCP, Earnings Press Release 11-15 (Apr. 24, 2019), *available at* https://www.sec.gov/Archives/edgar/data/1555538/000119312519115644/d737996dex991.htm.

46 *See id*. at 4.

47 *Id.*

48 *See* SunCoke, Earnings Press Release 4 (Apr. 24, 2019), *available at* https://www.sec.gov/Archives/edgar/data/1514705/000119312519115649/d713636dex991.htm.

between GAAP and non-GAAP financial measures,[49] as do other communications SunCoke makes to its shareholders.[50]

126. Despite these cautionary messages, Defendants inexplicably withheld from unitholders the financial figures necessary to reconcile the differences between non-GAAP and GAAP projected financial metrics in their consideration of the value of the Partnership, the value of SunCoke, and the merits and risks facing them with respect to the Merger.

127. The shortcomings of the non-GAAP metrics referred to in the Partnership's earnings releases and SEC filings were consistent with longstanding cautionary language appearing in guidance published for valuation and financial analysis. According to The Valuation Handbook:

> Many have objected to the use of . . . so-called non-GAAP measures. The [SEC] and the International Organization of Securities Commissions ("IOSCO") are among them. At the end of the previous century and the start of this century, the SEC debated the subject in many comment letters that were sent to companies using such measures. In May 2002, the IOSCO also cautioned issuers, investors and other users of financial information to use care when presenting and interpreting non-GAAP measures.[51]

---

[49] *Id*. at 11-12.

[50] *See*, *e.g.*, SunCoke, SunCoke Investor Presentation 31, 37-39 (Form 425) (Feb. 26, 2019), *available at* https://www.sec.gov/Archives/edgar/data/1514705/000119312519052051/d712499d425.htm.

[51] The Valuation Handbook 531.

128. A Law360 article indicated that "[i]n recent years, the use of non-GAAP financial measures has become more widespread, and the magnitude of the differences between non-GAAP and GAAP . . . measures has grown."[52] The article went on to say that "[t]he SEC continues to emphasize the need for caution with regard to the use of non-GAAP measures[,]" and to cite sources indicating that in 2015 of 67% companies in the Dow Jones Industrial Average reported non-GAAP earnings per share ("EPS") in addition to GAAP EPS and of those reporting non-GAAP EPS, 90% (18 out of 20) reported non-GAAP EPS that was on average approximately 31% higher than EPS reported based on GAAP,[53] and that earnings for S&P 500 firms grew nearly 14% from 2012 to 2015 based on non-GAAP measures, but were essentially unchanged based on GAAP.[54]

129. Recent growth in the appearance of non-GAAP metrics in proxy statements has been significant. According to accounting research firm Audit

---

52 Elaine Harwood, Frank Mascari and Laura Simmons, *SEC's Renewed Focus On Non-GAAP Measures: 1 Year Later*, Law360.com (May 16, 2017, 3:56 PM), *available at* https://www.law360.com/articles/920528/sec-s-renewed-focus-on-non-gaap-measures-1-year-later (footnote omitted).

53 John Butters, *Did DJIA Companies Report Higher Non-GAAP EPS in FY 2015?*, FactSet (Mar. 11, 2016), *available at* https://insight.factset.com/2016/03/earningsinsight_03.11.16.

54 Michael Rapoport and Dave Michaels, *SEC Tightens Crackdown on 'Adjusted' Accounting Measures*, Wall Street Journal, May 18, 2016, *available at* https://www.wsj.com/articles/sec-tightens-crackdown-on-adjusted-accounting-measures-1463608923.

Analytics, "more and more proxy statements include non-GAAP language. In 2009, fewer than 20% of proxies had such language; but by 2016, nearly 60% did."[55]

130. Investing is always a forward-looking endeavor, and a direct examination of the benefits anticipated from a given investment provides insight that is unavailable in any other way – even from analyses as important as those based on the market approach (which entails comparison to comparable public companies and precedent merger transactions). It therefore stands to reason that a reconciliation of non-GAAP to GAAP *projected* financial metrics is of at least comparable – if not greater – importance than the same information provided on an *historical* basis.

131. This is perhaps especially true in the instance of SXCP, because the fairness opinion which formed part of the basis for the board's recommendation to unitholders did not refer to any GAAP financial measures. The only financial measures underlying Citi's valuation analysis were non-GAAP measures.

a. *Selected Public Companies Analysis*:[56] Adjusted EBITDA, asset EBITDA;

b. *Discounted Cash Flow Analyses*:[57] Unlevered free cash flow, Adjusted EBITDA, asset EBITDA;

---

55 Derryck Coleman and Olga Usvyatsky, *Use of Non-GAAP in Proxy Statements, Audit Analytics* (June 16, 2016), *available at* http://www.auditanalytics.com/blog/use-of-non-gaap-in-proxy-statements/.

56 S-4/A 51-52.

57 *Id.* at 54-55.

c. *Has/Gets Analysis*:[58] Unlevered free cash flow, Adjusted EBITDA, asset EBITDA, Cost Savings; and

d. *Certain Illustrative Pro Forma Financial Effects of the Merger Analysis*:[59] Distributable Cash Flow, Cash Available for Dividends, Distributions, Cost Savings.

132. Furthermore, the Registration Statement seems to imply that the Adjusted EBITDA figures used by Citi in its analysis correspond to the similarly titled figures contained in the financial forecasts. However, it does not specify that this is true, nor does it otherwise provide enough detail about the formulae used by Citi to have enabled SXCP's unitholders to have ascertained this for themselves.

## BREACHES OF DUTY

133. The Limited Partnership Agreement Section 7.9(b) regarding Standards of Conduct and Modification of Duties (emphasis supplied) states:

> Whenever the General Partner makes a determination or takes or declines to take any other action, or any of its Affiliates causes it to do so, in its individual capacity as opposed to in its capacity as the general partner of the Partnership, whether under this Agreement or any other agreement contemplated hereby or otherwise, then the General Partner, or such Affiliates causing it to do so, are entitled, to the fullest extent permitted by law, to make such determination or to take or decline to take such other action free of any fiduciary duty or other duty existing at law, in equity or otherwise or obligation whatsoever to the Partnership, any Limited Partner, any other Person who acquires an interest in a Partnership Interest or any other Person who otherwise is bound by this Agreement, and the General Partner, or such

---

[58] *Id.* at 55.
[59] *Id.* at 56.

> Affiliates causing it to do so, shall not, to the fullest extent permitted by law, **be required to act in good faith** or pursuant to any other standard imposed by this Agreement or any other agreement contemplated hereby or under the Delaware Act or any other law, rule or regulation or at equity. By way of illustration and not of limitation, whenever the phrases, "at the option of the General Partner," "in its sole discretion" or some variation of those phrases, are used in this Agreement, it indicates that the General Partner is acting in its individual capacity. For the avoidance of doubt, whenever the General Partner votes or transfers its Partnership Interests, or refrains from voting or transferring its Partnership Interests, it shall be acting in its individual capacity.

(emphasis added).

134. The Limited Partnership Agreement Section 7.9(c) regarding Standards of Conduct and Modification of Duties (emphasis supplied) defines the term Special Approval and states:

> **Whenever a potential conflict of interest exists or arises between the General Partner or any Affiliates**, on the one hand, **and** the Partnership, any Group Member or any Partner, **any other Person who acquires an interest in a Partnership Interest** or any other Person who is bound by this Agreement on the other hand, **the General Partner may in its discretion submit any resolution or course of action with respect to such conflict of interest for (i) Special Approval** or (ii) approval by the vote of a majority of the Common Units (excluding Common Units owned by the General Partner and its Affiliates). If such course of action or resolution receives Special Approval or approval of a majority of the Common Units (excluding Common Units owned by the General Partner and its Affiliates), then such course of action or resolution shall be conclusively deemed approved by the Partnership, all the Partners, each Person who acquires an interest in a Partnership Interest and each other Person who is bound by this Agreement, and shall not constitute a breach of this Agreement, of any Group Member Agreement, of any agreement contemplated herein or therein, or of any fiduciary or other duty existing at law, in equity or otherwise or obligation of any type whatsoever.

(emphasis added).

135. On December 3, 2018, the SXCP board adopted resolutions formally delegating authority to the SXCP Conflicts Committee, consisting of John W. Somerhalder II and Martha Z. Carnes, to review, evaluate and negotiate the terms of the potential merger and evaluating whether "Special Approval" was appropriate. Clearly the two theoretically independent members of the Conflicts Committee, charged with a duty of good faith to protect the interests of the minority unitholders, were surrounded by sea of extremely conflicted individuals.

136. The entire process that ensued was a sham. SXC concedes in the S-4/A that the SXCP's (target's) internal projections were created by employees of SXC (buyer). Whatever information was gathered for the Conflicts Committee to review (it is not disclosed sufficiently to know exactly what was included, or in what form), it was selected and provided by the very parties that had irreconcilable conflicts vis-a-vis the minority unitholders. The Conflicts Committee then issued a so-called "Special Approval" on February 4, 2019, thirty-two days before the Registration Statement was filed, under penalty of SEC sanctions, the primary purpose of which "is to protect investors by requiring publication of material information thought necessary to allow them to make informed . . . decisions concerning public offerings of securities[.]"[60] There was no provision for further review or analysis. On that

[60] *Pinter v. Dahl*, 486 U.S. 622, 638 (1988); *see also SEC v. Ralston Purina Co.*, 346 U.S. 119, 124 (1953); *Desaigoudar v. Meyercord*, 223 F.3d 1020, 1024 (9th Cir. 2000).

day, February 4, 2019, the Conflicts Committee approved the General Partner entering into the Support Agreement with the majority shareholder, SC&C (a wholly owned subsidiary of SunCoke), to deliver the required votes, pursuant to its ownership of 61.7% of outstanding common units, to complete the merger within two business days *after* the effectiveness of the S-4/A. The Support Agreement was self-described as irrevocable.[61]

137. Because the "Special Approval" process was not structured reasonably or in good faith, but in bad faith, and the approval was issued in bad faith based solely on a completely conflicted system of information gathering, it was a nullity. Because the deficient "Special Approval" was obtained in bad faith and is a nullity, it did not trigger the protections enumerated in Section 7.9 of the Limited Partnership Agreement that allowed for the votes of the majority holder of units by SC&C to have been counted towards the Merger.

138. When acting in a conflicted position and not shielded by a valid "Special Approval" from Conflicts Committee under the Limited Partnership Agreement, the General Partner Defendant Board members owed the minority

[61] *See* Support Agreement 2, *available at* https://www.sec.gov/Archives/edgar/data/1514705/000119312519027607/d700877dex101.htm, the full body of which is incorporated by reference herein.

unitholders general fiduciary duties, including the duties of care and loyalty and good faith.

**LOSS CAUSATION**

139. The S-4/A's material omissions and misrepresentations of the projected financial performance of SXCP bears directly on the valuation of the outstanding common units and the fairness of the Merger Consideration.

140. Further, the decision of the Conflicts Committee should be considered a nullity. The Support Agreement should be rescinded and the merger should be unwound.

141. In the alternative, Plaintiffs should be awarded recissory damages to be determined by the enlightened conscience of a fact finder in an amount equal to the difference between the value paid for the units of SXCP and their true value at the time of the merger, plus interest and such other damages as are appropriate.

142. SunCoke attempted to take over SXCP and squeeze out minority unitholders in a similar transaction at a value of $17.60, which effort was rejected by the Conflicts Committee (with different members at that time).

143. In January 2018, analysts had valued SXCP at a value of between $21 and $30 per common unit with "significant potential upside" if domestic steel

utilization improves.[62] SC&C acquired 61.7% of SXCP units in the open market at per unit prices in excess of the Merger Consideration in ranges of $17.67 to $18.00.

144. In November 2016, one of SXCP's top ten unitholders, Capital Family Holdings, submitted a letter to the SXCP Conflicts Committee and the SXCP board with a valuation of $29.70.[63] Capital Family Holdings also has objected to the current Merger.[64]

145. The trend in SXCP key data that drives a valuation obtained from the public filings and disclosures from 2016 (when offer was at $17.60) to the current offer (which is based on an exchange ratio of approximately $13) is in the below table. SXCP revenues grew substantially:

| SXCP Key data: | | | |
|---|---|---|---|
| | 12/31/2018 | 12/31/2017 | 12/31/2016 |
| Total Revenues | $ 892.1 | $ 845.6 | $ 779.7 |
| Adj EBIDTA | $ 212.5 | $ 221.3 | $ 213.0 |
| Total Assets | $ 1,619.5 | $ 1,641.4 | $ 1,696.0 |
| L/T Debt | $ 793.3 | $ 818.4 | $ 805.7 |

---

62 *See, e.g.*, Cornerstone Investors, *SunCoke Energy Partners: 14% Yield and Potential Takeout Makes for a Compelling Buy*, Seeking Alpha (Jan. 8, 2018, 10:10 AM), *available at* https://seekingalpha.com/article/4135916-suncoke-energy-partners-14-percent-yield-potential-takeout-makes-compelling-buy.

63 Simon Zolotarev, *Capital Family Holdings: Offer from SXC to Acquire SXCP is Deeply Inadequate*, Business Wire (Nov. 30, 2016), *available at* www.businesswire.com/news/home/20161130005303/en/Capital-Family-Holdings-Offer-SXC-Acquire-SXCP.

64 Simon Zolotarev, *Capital Family Holdings: Put Offer to INDEPENDENT SXCP Holders*, Contify via COMTEX (Feb. 19, 2019, 11:08 AM), *available at* www.marketwatch.com/press-release/capital-family-holdings-put-offer-to-independent-sxcp-holders-2019-02-20.

146. Thus, the Merger Consideration was not fair and SXCP unitholders seek damages in an amount reflecting the fair value of the units.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and 17 C.F.R. § 244.100 Promulgated Thereunder)**

147. Lead Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

148. Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

149. As set forth above, the S-4/A omits information required by SEC Regulation G, 17 C.F.R. § 244.100, which independently violates Section 14(a). SEC Regulation G, among other things, requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure and a reconciliation "by schedule or other clearly understandable

method" of the non-GAAP measure to the "most directly comparable" GAAP measure. 17 C.F.R. § 244.100(a).

150. The failure to reconcile the non-GAAP financial measures included in the S-4/A violates Regulation G and constitutes a violation of Section 14(a).

151. As a direct and proximate result of the dissemination of the false and/or misleading S-4/A Defendants used to recommend that unitholders approve the Merger, Lead Plaintiff and the Class suffered damages and actual economic losses (i.e. the difference between the value they received as a result of the Merger and the true value of their units prior to the merger) in an amount to be determined at trial and are entitled to such equitable relief as the Court deems appropriate, including rescissory damages.

## COUNT II

### (Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder)

152. Lead Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

153. SEC Rule 14a-9 prohibits the solicitation of unitholder votes in registration statements that contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9(a).

154. Regulation G similarly prohibits the solicitation of unitholder votes by "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure . . . contains an untrue statement of a material fact or *omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure . . . not misleading*." 17 C.F.R. § 244.100(b) (emphasis added).

155. Defendants issued the S-4/A with the intention of soliciting unitholder support for the Merger. Each of the Defendants reviewed and authorized the dissemination of the S-4/A, which fails to provide critical information regarding, amongst other things, the financial projections for the Partnership.

156. In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as directors and/or officers, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the S-4/A, but nonetheless failed to obtain and disclose such information to unitholders although they could have done so without extraordinary effort.

157. The Individual Defendants knew or were negligent in not knowing that the S-4/A is materially misleading and omits material facts that are necessary to

render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Merger.

158. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the S-4/A, rendering the sections of the S-4/A identified above to be materially incomplete and misleading.

159. The Individual Defendants were, at the very least, negligent in preparing and reviewing the S-4/A. The preparation of a registration statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the S-4/A or failing to notice the material omissions in the S-4/A upon reviewing it, which they were required to do carefully as SXC's and the Partnership's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Partnership's financial projections.

160. SXCP is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the S-4/A.

161. The misrepresentations and omissions in the S-4/A are material to Lead Plaintiff and the Class, who were deprived of their right to cast an informed vote

because such misrepresentations and omissions were not corrected prior to the vote on the Merger.

162. As a direct and proximate result of the dissemination of the false and/or misleading S-4/A Defendants used to recommend that unitholders approve the Merger, Lead Plaintiff and the Class suffered damages and actual economic losses (i.e. the difference between the value they received as a result of the Merger and the true value of their units prior to the merger) in an amount to be determined at trial and are entitled to such equitable relief as the Court deems appropriate, including rescissory damages.

## COUNT III

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

163. Lead Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

164. The Individual Defendants acted as controlling persons of SXCP and SXC within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as directors and/or officers of SXCP and SXC, and participation in and/or awareness of the Partnership's operations and/or intimate knowledge of the incomplete and misleading statements contained in the S-4/A filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Partnership, including the

content and dissemination of the various statements that Lead Plaintiff contends are materially incomplete and misleading.

165. Each of the Individual Defendants was provided with or had unlimited access to copies of the S-4/A and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

166. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Partnership and/or SXC (many of them wore multiple hats as shown above) and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein and exercised the same. The S-4/A at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Merger. They were thus directly involved in preparing the S-4/A.

167. In addition, as the S-4/A sets forth at length, and as described herein, that the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The S-4/A purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

168. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

169. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Lead Plaintiff and the Class will be irreparably harmed.

## COUNT IV

**(Against the Members of the General Partner's Board for Breach of Duty of Good Faith and Fair Dealing)**

170. The General Partner's Board, including members of the Conflicts Committee, violated their duty of good faith to the minority shareholders by recommending the Merger Agreement and that SXCP to enter into the Support Agreement knowing that the process by which the Special Approval was issued was defective and that the decision was conflicted and potentially not in the best interest of the minority unitholders.

## COUNT V

**(Against the Members of the General Partner's Board for Breach of Fiduciary Duty and Duty of Good Faith and Fair Dealing)**

171. The General Partner's Board has violated its fiduciary duty and duty of

good faith to the minority unitholders by ignoring the allegations of previous filed complaints regarding this Merger and not suspending and postponing the June 27, 2019 unitholder vote in order to allow the Conflicts Committee to consider the public disclosures made regarding the Merger and advise as to whether the votes delivered (which votes may be changed as a matter of right any time before June 27, 2019) should have been rescinded.

**COUNT VI**

**(Against the General Partner and its Board Members for Breach of Contract)**

172. The Limited Partnership Agreement constitutes a contract between SXCP, the General Partner, and the Limited Partners of SXCP.

173. Under the terms of the Limited Partnership Agreement and 6 Del. C. §17-1101, the General Partner and its Board Members owe SXCP's Limited Partners, including Lead Plaintiff, a duty of good faith and fair dealing and is prohibited by these duties from causing in bad faith the Limited Partnership to be sold for inadequate consideration.

174. The General Partner and its Board, including its Conflicts Committee, breached these duties by voting to sell the Limited Partnership for inadequate consideration and therefore breached the terms of the Limited Partnership Agreement.

**COUNT VII**

**(Against the General Partner and its Board Members for Breach of Contract)**

175. The Limited Partnership Agreement constitutes a contract between SXCP, the General Partner, and the Limited Partners of SXCP.

176. Under the terms of the Limited Partnership Agreement and 6 Del. C. §17-1101, the General Partner and its Board Members owe SXCP's Limited Partners, including Lead Plaintiff, a duty of good faith and fair dealing and are prohibited by these duties from causing in bad faith the Limited Partnership to be sold without due diligence and consideration of all publicly available information made available within a reasonable time of the sale date.

177. The General Partner and its Board of Directors, including the Conflicts Committee, breached these duties, and therefore breached the terms of the Limited Partnership Agreement, by agreeing to the terms of this Merger by signing the Support Agreement on February 4, 2019 and agreeing that deciding votes in favor of the Merger would be "irrevocably" committed almost five months in advance of the actual date set for the public unitholders to vote, with no provision for the Conflicts Committee to monitor newly disclosed public information, and with no provision for the Conflicts Committee to rescind its approval and recommendation based on changed circumstances in the interim five months. Further, the Conflicts Committee did not seek to rescind or reconsider its approval of the Merger, despite

substantially changed circumstances which were adverse to the minority unit holders. This left the minority unit holders exposed to market downturns and adverse events and effectively made them guarantors of SXCP for a period of five months. And indeed, the value of the Merger Consideration decreased substantially over the course of the next five months causing significant economic harm to minority unit holders.

## COUNT VIII

**(Against SXC and its Directors for Aiding and Abetting Breach of Contract)**

178. SXC and its Directors knew at all times of the actions that SXCP and its directors, including members of the Conflicts Committee, were taking in breach of their contractual duties, duties of good faith and fair dealing, and duties to not act in bad faith.

179. Throughout the Merger transaction process, SXC aided and abetted SXCP its General Partner and the directors, including members of the Conflicts Committee, in committing said breaches duty.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff prays for judgment and relief as follows:

A. Declaring that this action is properly maintainable as a Class Action and certifying Lead Plaintiff as Class Representative and his counsel as Class Counsel;

B. Declaring the Special Approval of the Conflicts Committee to be a nullity, and the merger to be void and without legal effect or, in the alternative, Plaintiffs should be awarded recissory damages to be determined by the enlightened conscience of a fact finder in an amount equal to the difference between the value paid for the units of SXCP and their true value at the time of the merger, plus interest and such other damages as are appropriate;

C. Awarding Lead Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

D. Granting such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Lead Plaintiff demands a trial by jury on all issues so triable.

Dated: September 17, 2019

Respectfully submitted,

**FARUQI & FARUQI, LLP**

By: */s/ Michael Van Gorder*
Michael Van Gorder (#6214)
3828 Kennett Pike, Suite 201
Wilmington, DE 19807
Tel.: (302) 482-3182
Email: mvangorder@faruqilaw.com

*Lead Counsel*

**OF COUNSEL:**

**FARUQI & FARUQI, LLP**
Nadeem Faruqi
James M. Wilson, Jr.
685 Third Ave., 26th Fl.
New York, NY 10017
Tel.: (212) 983-9330
Email: nfaruqi@faruqilaw.com
Email: jwilson@faruqilaw.com

*Lead Counsel*